# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRY PAUL KEEVER,<br><br>             Petitioner,<br><br>    v.<br><br>B. GOWER,<br><br>             Respondent. | Case No. 1:15-cv-01504-EPG-HC<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, DIRECTING CLERK OF COURT TO CLOSE CASE, AND DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY |

Petitioner Terry Paul Keever is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. In the petition, Petitioner raises the following claims for relief: (1) venue; (2) judicial bias; (3) juror bias; (4) prosecutorial misconduct; (5) ineffective assistance of counsel; and (6) insufficient evidence to support the conviction.

For the reasons discussed herein, the undersigned denies the petition for writ of habeas corpus.

## I.

## BACKGROUND

On November 30, 2012, Petitioner was convicted by a jury in the Tuolumne County Superior Court of unlawfully and willingly sending or causing to be sent a false bomb, in violation of California Penal Code section 148.1(d). (CT[1] 58). Petitioner was sentenced to an

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on December 29, 2015. (ECF No. 18).

imprisonment term of ten years. (CT 97). On July 30, 2014, the California Court of Appeal, Fifth

Appellate District affirmed the judgment. People v. Keever, No. F066553, 2014 WL 3738768, at

*11 (Cal. Ct. App. July 30, 2014). The California Supreme Court summarily denied the petition

for review on October 15, 2014. (LDs[2] 9, 10).[3]

On September 21, 2015, Petitioner filed the instant federal petition for writ of habeas

corpus. (ECF No. 1). Respondent has filed an answer to the petition. (ECF No. 17). The parties

have consented to the jurisdiction of a United States magistrate judge to conduct all proceedings

in this case pursuant to 28 U.S.C. § 636(c). (ECF Nos. 10–12).

## II.

## STATEMENT OF FACTS[4]

***Discovery of the false bomb***
On November 28, 2011, Charles Combs worked for a private company that
assisted the sheriff's department with security for the Tuolumne County
Courthouse, located on West Yaney in Sonora. Combs screened employees and
the public as they entered the courthouse. Combs testified it was particularly busy
that morning.

Around 8:40 a.m., someone advised Combs there was a package in front of the
courthouse. It was still very busy, and Combs continued to screen people until
there was a break in the rush. He went outside and found a bag in plain sight,
about five feet beyond the entryway.

In violation of security protocol, Combs brought the bag into the courthouse and
ran it through the X-ray machine. The contents looked suspicious, like a starter
and a power supply. Combs left it on the X-ray machine and called a deputy
sheriff.

Tuolumne County Sheriff's Deputy Brandon Green arrived at the X-ray machine.
He looked on the screen and saw a box and wires. He opened the bag and saw
three long, black cylindrical objects which were wrapped in tape, with a wire
coming out from the middle and going into a black box.

Deputy Green thought it was an explosive device and immediately took the bag
outside the courthouse. He placed it by a cement wall along the street, notified his
superiors, and kept the area clear.

Around 9:15 a.m., the courthouse was evacuated because of the device.

[2] "LD" refers to the documents lodged by Respondent on December 29, 2015. (ECF No. 18).
[3] The record before this Court establishes that Petitioner also filed two state petitions for writ of habeas corpus in the Tuolumne County Superior Court, which denied both petitions. (LDs 11–14). However, these state habeas petitions involved challenges to Tuolumne County Superior Court case number CRF22122, which is unrelated to the conviction under attack in the instant federal petition.
[4] The Court relies on the California Court of Appeal's July 30, 2014 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

At 9:40 a.m., Calaveras County Sheriff's Detective Josh Crabtree responded to the courthouse lawn where Green had placed the bag. Crabtree served with the bomb squad. Crabtree learned that someone had already moved the package and it had not exploded, which meant it was not a victim-activated device.

Detective Crabtree testified the device was inside a grocery bag. He opened the bag and found three road flares wrapped together with black electrical tape. There was a computer cord "like you have hooked up to your laptop," with the top shaved off to simulate a time fuse. The cord was attached to a power box.

Based on his experience, it was immediately apparent to Detective Crabtree that the device in the bag was not an explosive. The courthouse reopened around 10:45 a.m.

Detective Crabtree took the device to the investigations office. He used gloves to disassemble the components. He unwrapped the black electrical tape and noticed there were fibers on the tape, similar to material from a sweater or carpet. He put the electrical tape and fibers in separate Ziploc plastic bags, and preserved the other parts for analysis.

**_Defendant is remanded into custody_**
Around 3:45 p.m. on November 28, 2011, the same day as the bomb scare, defendant appeared in court as scheduled on an apparently unrelated matter, and he was remanded into custody in the jail.

**_Defendant contacts the police_**
On February 29, 2012, defendant called Sergeant Vanderwiel of the Sonora Police Department and said he had information about the November 2011 bomb scare. Defendant said he also had information about the arson of patrol cars from the sheriff's department, which happened a few days after the bomb scare. Defendant said he was in custody at the jail, but he was on a day-pass for medical reasons and wanted to meet with Vanderwiel that day.

Sergeant Vanderwiel met with defendant that day. Defendant said that while he was serving time in jail, "he overheard two other inmates bragging about doing the arson to the patrol vehicles. He also told me that one of them had also admitted to leaving the fictitious bomb at the courthouse." Defendant said one of the inmates was named "Travis," and the inmates discussed someone named "T.N.T. Mike" as someone involved in the arson.

Defendant said he wanted an early release from jail in exchange for cooperating with the police. Defendant offered to work with Sergeant Vanderwiel and try to tape-record a statement from the inmates.

On March 15, 2012, Sergeant Vanderwiel met with defendant in the jail. Defendant said the culpable inmate's name was "Travis Veysey." According to defendant, Veysey said he was responsible for the fake bomb, and it was in a bag which said, "Have a nice day."[5] Defendant also said that "Jeremy Snead" was involved in the arson of the patrol cars.

As a result of Sergeant Vanderwiel's meeting with defendant, Sergeant Ford of the Tuolumne County Sheriff's Department also met with defendant in jail. Ford

---

[5] At the preliminary hearing, Sergeant Vanderwiel testified the canvas bag which contained the fake bomb had printed on it: "'Have a pleasant day.'"

was investigating the arson of the patrol cars and was advised that defendant said he had information about the crime. Defendant told Ford that he did not have any information about the arson, but "if he were to get out of jail, that he could probably get information regarding that for us." Ford believed defendant just wanted to be released from custody. Ford did not have further conversations with him.

### Discovery of defendant's DNA

After Sergeant Vanderwiel met with defendant, he sent the package with the fake bomb components to the Department of Justice for analysis.[6] A criminalist examined the black electrical tape that had been wrapped around the road flares. A unique DNA profile was generated from a swab taken from the tape.

The criminalist entered the DNA profile in the Combined DNA Index System (CODIS), and a "cold hit" matched the profile to defendant, whose DNA profile was already in the database.

On June 15, 2012, Sergeant Vanderwiel was advised about the "cold hit" of defendant's DNA profile on the electrical tape.

On June 16, 2012, Sergeant Vanderwiel visited defendant in jail. Vanderwiel told defendant "that I did have a suspect in the case based on D.N.A. evidence, and I advised him that it was him." Defendant immediately had a "deer in the headlight look." He became "a little bit visibly nervous and he denied involvement. He told me that he was in custody at the time so it couldn't have been him." Defendant repeated that "'[i]t couldn't have been me; I was in custody.'"

Sergeant Vanderwiel checked the jail records and determined defendant appeared in court and was remanded into custody at 3:45 p.m. on November 28, 2011—several hours after the fake bomb had been found at the courthouse at 8:40 a.m.

Sergeant Vanderwiel again met with defendant in jail and advised him that he was not in custody when the fake bomb was found. He asked defendant to explain how his D.N.A. was on the device. Defendant said it couldn't have been his DNA because he was in custody. Defendant also said he must have been set up.

A sample of defendant's DNA was obtained. The criminalist who examined the black tape compared defendant's known DNA sample with the profile generated from the tape and again determined they matched.

As for the separate incident of the arson of the patrol cars, Sergeant Vanderwiel testified Samuel Shockley subsequently pleaded guilty to that crime. Defendant never gave Shockley's name, and no one named "T.N.T. Mike" or Jeremy Snead was implicated in the arson. The arson was apparently unrelated to the fake bomb.

### DEFENSE

Eugene Salvetti testified he lived in Sonora. He had known defendant for three or four years. Salvetti used to live across the street from a garage that defendant rented and used for storage. Salvetti testified defendant's garage was full of tools, car parts, fishing gear and junk. It had been burglarized several times, and sometimes defendant forgot to close and lock the door. Salvetti did not know

---

[6] At the preliminary hearing, Sergeant Vanderwiel testified that he determined "T.N.T. Mike" was "Michael Davis." He sent the fake bomb components to the Department of Justice for analysis because he hoped to find Davis's DNA on the pieces to determine whether he could build a case against him.

4

when these incidents occurred, if anything was taken from the garage, or if defendant reported the thefts to the police.

Salvetti testified that on November 28, 2011, he was living elsewhere in Sonora. He was listening to his police scanner early that morning and heard about the bomb scare at the courthouse.

About 10 to 15 minutes after Salvetti heard about the bomb scare, defendant called Salvetti and asked if he could come by his house on his way to court. Salvetti believed defendant was at home when he made this call because he heard him talking to his girlfriend while he was on the phone.

Salvetti testified he told defendant there was a bomb scare at the courthouse, they were looking at a backpack, and the bomb squad had been called. Salvetti testified that during the call, he thought defendant "talked to his girlfriend and, you know, they kind of had a little laugh about it...." "[T]hey thought it was kind of humorous that, you know, things might change" because they had their schedule planned, and "the bomb squad is surrounding the courthouse...." Salvetti testified that defendant was supposed to be in court that day, but "it might be put off for hours. [I]t was just humorous that there was a bomb at the courthouse the day he is supposed to go to court and, you know, I think I joked about, 'Yeah, it's just your luck,' you know?" Salvetti testified defendant and his girlfriend, Donna Ratliff, arrived at his house about an hour after the phone conversation.

Donna Ratliff testified that she had lived with defendant for over 16 years. Ratliff testified defendant's storage garage had been burglarized a few times over the years. In February 2011, Ratliff told defendant they couldn't afford to pay rent on the garage anymore, and told him to get rid of the contents. Defendant had some garage sales, gave away some things, and threw away a lot of belongings.

Ratliff testified defendant was scheduled to report to jail at 1:00 p.m. on November 28, 2011. Ratliff woke up that morning between 7:00 a.m. and 8:00 a.m., and defendant was at home. Defendant worked outside while she had coffee. They went to Salvetti's house on the way to jail. They used Ratliff's truck because defendant's vehicle was not working. Ratliff did not believe defendant used her truck earlier that morning, and she did not usually allow him to drive it. Ratliff did not recall talking about the bomb incident or laughing about it with defendant.[7] Ratliff admitted she had been convicted of possession of stolen property in 2002.

***Rebuttal***
Sergeant Vanderwiel testified there were no reports of burglaries or thefts from defendant's rented garage.

Keever, 2014 WL 3738768, at *1–4 (footnotes in original).

///

///

---

[7] The prosecutor moved to introduce possible impeachment evidence about Donna Ratliff's credibility. The prosecutor stated defendant had been convicted of domestic violence after he severely beat Ratliff, but she resumed living with him after the incident. The prosecutor argued the domestic violence evidence and their reconciliation was relevant to impeach Ratliff's credibility about defendant's alibi, and show that Ratliff would say anything to help defendant. The court denied the prosecution's motion and excluded the evidence.

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged convictions arise out of the Tuolumne County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Davis v. Ayala, 135 S. Ct. 2187, 2198 (2015); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been "adjudicated on the merits" in state court, "AEDPA's highly deferential standards" apply. Ayala, 135 S. Ct. at 2198. However, if the state court did not reach the merits of the claim, the claim is reviewed *de novo*. Cone v. Bell, 556 U.S. 449, 472 (2009).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court

decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA and the Court must defer to the state court's decision. <u>Moses v. Payne</u>, 555 F.3d 742, 754 (9th Cir. 2008) (alterations in original) (quoting <u>Wright v. Van Patten</u>, 552 U.S. 120, 125, 123 (2008)).

If the Court determines there is clearly established Federal law governing the issue, the Court then must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413. A state court decision involves "an unreasonable application of[] clearly established Federal law" if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." <u>Richter</u>, 562 U.S. at 102. That is, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Id.</u> at 103.

If the Court determines that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," and the error is not structural, habeas relief is nonetheless unavailable unless it is established that the error "had substantial and injurious effect or influence" on the verdict. <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (internal quotation mark omitted) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)).

AEDPA requires considerable deference to the state courts. The Court looks to the last reasoned state court decision as the basis for the state court judgment. <u>See</u> <u>Brumfield v. Cain</u>, 135 S. Ct. 2269, 2276 (2015); <u>Johnson v. Williams</u>, 568 U.S. 289, 297 n.1 (2013); <u>Ylst v.</u>

Nunnemaker, 501 U.S. 797, 806 (1991). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the record is not *de novo* review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court record and "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

**IV.**

**DISCUSSION**

**A.  Procedural Default**

A federal court will not review a petitioner's claims if the state court has denied relief on those claims pursuant to a state law procedural ground that is independent of federal law and adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722, 729–30 (1991). This doctrine of procedural default is based on the concerns of comity and federalism. Id. at 730–32. However, there are limitations as to when a federal court should invoke procedural default and refuse to review a claim because a petitioner violated a state's procedural rules. Procedural default can only block a claim in federal court if the state court "clearly and expressly states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989).

In determining whether a state procedural ruling bars federal review, the Court looks to the "last reasoned opinion on the claim." Ylst, 501 U.S. at 804. Therefore, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

With respect to the forfeiture or waiver of certain claims, the California Court of Appeal stated:

## II. *Forfeiture/waiver*

Defendant concedes he did not object to venue, the trial judge, or any aspect of the criminal proceedings. However, defendant asserts he has not forfeited or waived appellate review of his due process contentions because "the facts are undisputed and raise important issues of public concern, namely whether California will allow its criminal jurisprudence to sink to the level of promoting expediency at the expense of a defendant's right to due process and a fair trial."

Defendant contends the "objective evidence" demonstrates he was tried by an "unfair tribunal presided over by a victim of the crime," and there was a reasonable probability the jurors were exposed to "prejudicial events outside the trial evidence" because the fake bomb "created an inherent and public atmosphere of fear that the jurors could not escape."

Despite his failure to preserve these issues, we will explain how the trial court ensured his constitutional rights to due process and a fair trial were preserved.

Keever, 2014 WL 3738768, at *8.

Here, the California Court of Appeal found that Petitioner forfeited his venue, judicial bias, and juror bias claims by failing to raise these issues in a motion to change venue. This is known as the contemporaneous objection rule. As the California Court of Appeal clearly and expressly stated that its decision rests on a state procedural bar, procedural default is appropriate if the contemporaneous objection rule is independent and adequate.

To qualify as "independent," a state procedural ground "must not be 'interwoven with the federal law.'" Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting Michigan v. Long, 463 U.S. 1032, 1040–41 (1983)). "To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'" Walker v. Martin, 562 U.S. 307, 316 (2011) (quoting Beard v. Kindler, 558 U.S. 53, 60 (2009)). The Ninth Circuit has taken a burden-shifting approach to determining the adequacy of a state procedural ground. See Bennett v. Mueller, 322 F.3d 573, 586 (9th Cir. 2003). First, the state must plead an independent and adequate state procedural bar as an affirmative defense. The burden then shifts to the petitioner "to place that defense in issue." Id. The petitioner's burden can be satisfied by "asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule," Bennett, 322 F.3d at 586. If the

1    petitioner satisfies his burden, the burden shifts back to the state, which bears "the ultimate

2    burden of proving the adequacy" of the state procedural bar. Id. at 585–86.

3        In the instant case, Respondent asserts that California's contemporaneous objection rule

4    is an adequate and independent state procedural bar. (ECF No. 17 at 28–29, 32, 35).[8] Petitioner

5    has not raised any challenges to the adequacy of California's contemporaneous objection rule

6    and thus, has failed to place the defense in issue. Accordingly, the Court finds that the California

7    Court of Appeal applied an independent and adequate state procedural rule, and Petitioner has

8    procedurally defaulted his venue, judicial bias, and juror bias claims. See Kelly v. Swarthout,

9    599 F. App'x 267, 268 (9th Cir. 2015) (citing Paulino v. Castro, 371 F.3d 1083, 1093 (9th Cir.

10   2004)) ("We have previously found that the contemporaneous objection bar is an independent

11   and adequate state law ground that bars federal review of the underlying claim.").

12       A petitioner, however, may obtain federal review of a defaulted claim by demonstrating

13   either "(1) 'cause for the default and actual prejudice as a result of the alleged violation of

14   federal law,' or (2) 'that failure to consider the claims will result in a fundamental miscarriage of

15   justice.'" Jones v. Ryan, 691 F.3d 1093, 1101 (9th Cir. 2012) (quoting Coleman, 501 U.S. at

16   750). Although attorney error constituting ineffective assistance of counsel provides "cause" to

17   excuse procedural default, Coleman, 501 U.S. at 754, ineffective assistance generally must "be

18   presented to the state courts as an independent claim before it may be used to establish cause for

19   a procedural default," Murray v. Carrier, 477 U.S. 478, 489 (1986). Here, Petitioner presented an

20   independent ineffective assistance of counsel claim for failure to request a change of venue,

21   thereby denying Petitioner due process and a fair trial. A federal habeas court applies different

22   standards when reviewing ineffective assistance of counsel "as a substantive basis of relief and

23   as cause to avoid default of other claims." Visciotti v. Martel, 862 F.3d 749, 769 (9th Cir. 2016)

24   (internal quotation mark omitted) (quoting Fischetti v. Johnson, 384 F.3d 140, 154 (3d Cir.

25   2004)), cert. denied sub. nom. Visciotti v. Davis, 138 S. Ct. 1546 (2018).

26       Ordinarily procedural bar issues are resolved first, but courts have recognized that

27   "[p]rocedural bar issues are not infrequently more complex than the merits issues . . . so it may

28   _____
     [8] Page numbers refer to the ECF page numbers stamped at the top of the page.

well make sense in some instances to proceed to the merits if the result will be the same." *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). Accordingly, the Court will proceed to review the venue, judicial bias, and juror bias claims on the merits applying AEDPA deference. *See Apelt v. Ryan*, 878 F.3d 800, 825 (9th Cir. 2017) ("[W]hen a state court 'double-barrels' its decision—holding that a claim was procedurally barred and denying the claim on its merits—both its procedural default ruling and its merits ruling are entitled to deferential review by federal courts, as intended by AEDPA.").

**B. Venue**

In his first claim for relief, Petitioner asserts that he could not receive a fair trial in Tuolumne County given that the fake bomb was planted at the same courthouse in which the trial was conducted. (ECF No. 1 at 5, 9). Respondent argues that this claim was reasonably rejected by the state court. (ECF No. 17 at 24).

The challenge to venue was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. (LDs 9, 10). As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. *See Brumfield*, 135 S. Ct. at 2276; *Ylst*, 501 U.S. at 806.

In denying Petitioner's claim that he could not receive a fair trial in Tuolumne County, the California Court of Appeal stated:

> **I.** *Change of Venue*
> We begin with defendant's assertion that it was impossible for him to receive a fair trial in Tuolumne County because of the nature and circumstances of the charged offense, that he was tried and convicted in the same courthouse where the fake bomb was planted and found, and everyone involved in the prosecution of his case—the judge, the prosecutor, the bailiff, the clerk, and the court reporter— were victims of the crime and the subsequent evacuation of the building.
>
> Defendant was charged and convicted of a felony violation of section 148.1, subdivision (d), which states:
>
> > "Any person who maliciously gives, mails, sends, or causes to be sent any false or facsimile bomb to another person, or places,

causes to be placed, or maliciously possesses any false or facsimile bomb, with the intent to cause another to fear for his or her personal safety or the safety of others, is guilty of a crime punishable by imprisonment in a county jail not to exceed one year, or pursuant to subdivision (h) of Section 1170."

Defendant declares the nature of the charged offense "inherently provoke[d] sustained fear in its direct victims—and in the general public—because everyone is highly familiar and uniquely afraid of a bomb's explosive properties." "The combination of the nature of this offense and the location where the false bomb was found meant that everyone working in the courthouse was a direct victim of the crime." Defendant further asserts:

"Neither the judge (nor the prosecutor, clerk, reporter or bailiff) in the instant case was likely to be neutral after being victims of a false bombing attributed to [defendant].... The judge, along with the others, necessarily felt the sustained fear, alarm, and disorder that is inherent in any bomb threat. Not only was there a threat of a bomb in this case, but, more tangibly, it was known that a package had been found containing what appeared to be an explosive device. That fear was made more palpable by the forced evacuation of the entire courthouse. No one present could fail to be frightened, annoyed, and angered by the planting of a putative explosive device at their workplace."

Defendant argues that every resident of Tuolumne County was a "victim" of the offense, and the county residents who were selected as jurors in this case were also "victims" of the fake bomb since they "could not escape" the "inherent and public atmosphere of fear" which resulted from the discovery of the fake bomb. "The instant jurors were indirect victims as members of the general public who are considered highly familiar with and uniquely afraid of bombs and who could have been, or at least could imagine themselves to have been, walking or driving past the courthouse or sitting in the jury box when a bomb was discovered." "It was their courthouse and their public streets that were threatened and actually disrupted. The jurors were sitting in a jury box located in the threatened courthouse."

All of defendant's allegations should have been raised by a change of venue motion. A trial court should grant a motion for a change of venue when publicity has created a defendant will not receive a fair trial in the county. (§ 1033, subd. (a).) "The phrase 'reasonable likelihood' in this context 'means something less than "more probable than not," ' and 'something more than merely "possible." ' [Citation.]" (*People v. Proctor* (1992) 4 Cal.4th 499, 523.) The defendant has the burden of proving more than a mere possibility of unfairness. (*People v. Jenkins* (2000) 22 Cal.4th 900, 943.) In assessing the motion, the trial court considers the gravity and nature of the crime, the extent and nature of the publicity, the size of the community, and the status of the victim and the accused. (*Ibid.*) Such a motion should be supported by appropriate exhibits regarding the relevant factors, particularly press reports and other evidence about pretrial publicity. (See, e.g., *People v. Farley* (2009) 46 Cal.4th 1053, 1081, 1083–1084.)

Defendant's due process claims are meritless on the record before this court and are based on nothing but speculation. His failure to move for a change of venue, which presumably would have been accompanied by the appropriate supporting

exhibits, is fatal to his due process claims and forfeits appellate review of the issue. (See, e.g., *People v. Simon* (2001) 25 Cal.4th 1082, 1103–1104, 1107.) There is nothing in the appellate record to indicate the nature or circumstances of any news reports about the fake bomb, the effect of the discovery of the bomb on the general public and/or the courthouse staff, or even if the trial judge, the prosecutor, and any members of the public who were ultimately selected to sit on his jury were in the courthouse at the time the fake bomb was discovered, or suffered any type of impact or reaction from the event.

As we will address in section III, *post,* the only reference to pretrial publicity was defense counsel's statement prior to jury selection that there had been one news article about the fake bomb; defendant interjected that there were two news stories. Nevertheless, there is no evidence in the appellate record about the specific nature and content of these news reports or public reaction, if any, and, as we will discuss below, the court asked the potential jurors about their possible exposure to any news reports during voir dire.

### *Turnage and other bomb-related cases*

While defendant lacks any evidence in the record to support his due process claims about venue, he has instead cited to *People v. Turnage* (2012) 55 Cal.4th 62 (*Turnage*) for the proposition that defendant was tried for an offense that exploited "the public's *fear* of bombs, and that predictably provoke havoc and alarm." (*Id.* at p. 72, italics in original.) In that case, the defendant was convicted for violating section 148.1, subdivision (d), after he planted a fake bomb near a government building. On appeal, defendant claimed his felony conviction for violating section 148.1 violated his equal protection rights compared to an entirely different statute, section 11418.1. "The latter provision provides, in pertinent part, that anyone who places 'any false or facsimile of a weapon of mass destruction' (WMD) with the intent to cause fear in others is guilty of a misdemeanor. A violation of section 11418.1 (or the false WMD statute) may be punished as a felony only '[i]f the [perpetrator's] conduct causes another person to be placed in sustained fear'—an element not necessary under the false bomb statute for either misdemeanor or felony punishment." (*Id.* at p. 67.) The appellate court agreed with the defendant's equal protection claim. (*Ibid.*)

In *Turnage,* the California Supreme Court disagreed with the appellate court and held no equal protection violation occurred. (*Turnage, supra,* 55 Cal.4th at p. 67.)

> "The challenged distinction—allowing false bomb crimes to be punished as felonies without proof of sustained fear, while requiring such a showing for felony violations of the false WMD statute—is not irrational. The Legislature could reasonably assume that the public is highly familiar with, and uniquely afraid of, the explosive properties of bombs. Hence, mere observation or awareness of an object that looks like a bomb, and that was meant to instill fear like a bomb, is almost certain to cause the alarm and disorder associated with sustained fear under the statutory scheme."

> "Upon close examination, the same reasoning does not apply to false WMD's. A WMD is statutorily defined to include a vast array of chemical and biological substances, and radioactive and mechanical devices, weaponized for use in both conventional and unconventional forms against all kinds of targets, not just people. It is conceivable from a legislative perspective that, given the breadth

and relative novelty of WMD's, a facsimile of a WMD would not *necessarily* be recognized or cause fear, even where it is detected and was intended to do so. Requiring sustained fear for felony offenses under the false WMD statute, but not the false bomb statute, promotes a valid state interest in deterring and punishing the societal harm such crimes clearly cause." (*Id.* at pp. 67–68, italics in original.)

In the course of *Turnage's* equal protection analysis, the California Supreme Court reviewed the history of section 148.1, subdivision (d), and noted there was no statutory definition of the term "bomb." (*Turnage, supra,* 55 Cal.4th at p. 71.)

"Courts have explained that the Legislature is presumably aware of the manner in which bombs are used, and the frequency with which bombings occur. [Citation.] Everyone is assumed to 'know what a bomb is.' [Citation.] In fact, bombs are commonly understood to be so 'inherently dangerous' [citation] that possession can be unlawful 'even when [the device is] *not* set to explode.' [Citation.] Detonation can occur unexpectedly, while the object is concealed or if the bomber loses control over it, threatening intended and unintended victims alike. [Citation.] [¶] Because of these known dangers, section 148.1 has long prohibited various acts that exploit the public's *fear* of bombs, and that predictably provoke havoc and alarm...." (*Ibid.,* italics in original.)

In addition to *Turnage,* defendant also cites to two matters outside the record in support of his claim that it was impossible to receive a fair trial in Tuolumne County for the charged offense: An Internet citation to an article in the "Union Democrat" newspaper about the fake bomb; and an Internet citation to an article by Alan Dershowitz in "The Guardian" about the Boston Marathon bombing, with the quote that "virtually every Bostonian regards himself or herself as a victim of this horrendous crime."

Based on *Turnage* and the two extraneous sources, defendant asserts it was impossible for him to receive a fair trial in Tuolumne County because of the nature of the crime, and the certainty the general public would have reacted in the same way as the citizens of Boston after the bombing occurred in that city. Defendant asserts a change of venue should have been ordered even though he never made such a motion.

As we have already explained, these are issues which could have been explored in a motion for change of venue with appropriate supporting exhibits. Defendant's reliance on *Turnage's* description of the offense could well have applied to the members of the general public sworn as a jury in any county to hear a case about a fake bomb in a public place. As we will explain in section III, *post,* the superior court took appropriate steps to ensure defendant received a fair trial by questioning the prospective jurors about this issue during voir dire.

We further note that courts have exercised discretion to deny venue-transfer motions in well known and notorious cases involving substantial pretrial publicity and community impact, most notably the trial of the conspirators in the 1993 bombing of the World Trade Center in New York City. (See *United States v. Yousef* (2nd Cir. 2003) 327 F.3d 56, 78, 155–156.) The mere fact that defendant was charged with planting a fake bomb did not mean that it was impossible for him to receive a fair trial in the community where the incident occurred. Based on

the record before this court, there is no evidence that defendant's due process rights were violated.

Keever, 2014 WL 3738768, at *4–7.

"A fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136 (1955). Thus, the Constitution "do[es] not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial." Skilling v. United States, 561 U.S. 358, 378 (2010). In a line of cases addressing whether due process requires a change of venue, the Supreme Court has overturned convictions in cases that were "entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob," but the decisions do not "stand for the proposition that juror exposure to . . . news accounts . . . alone presumptively deprives the defendant of due process." Murphy v. Florida, 421 U.S. 794, 799 (1975). "Prominence does not necessarily produce prejudice, and juror *impartiality,* we have reiterated, does not require *ignorance*. A presumption of prejudice, our decisions indicate, attends only the extreme case." Skilling, 561 U.S. at 381 (citations omitted).

For example, in Rideau v. Louisiana, 373 U.S. 723 (1963), the police filmed the defendant's interrogation, which was conducted without counsel and resulted in a confession. On three separate occasions shortly before trial, a local television station broadcast the filmed interrogation and confession to audiences ranging from 24,000 to 53,000 individuals for a crime that had occurred in a parish with a population of approximately 150,000 people. Id. at 724. Estes v. Texas, 381 U.S. 532, 535 (1965), involved "[m]assive pretrial publicity totaling 11 volumes of press clippings." There were at least twelve cameramen in the courtroom for a two-day pretrial hearing that was "carried live by both radio and television, and news photography was permitted throughout," which "led to considerable disruption of the hearings," denied the "judicial serenity and calm to which [the defendant] was entitled," and resulted in "a bombardment of the community with the sights and sounds" of the hearing. Id. at 536, 538. In Sheppard v. Maxwell, 384 U.S. 333 (1966), "[f]or months virulent publicity about Sheppard and the murder had made the case notorious" before trial, "bedlam reigned at the courthouse during

15

the trial and newsmen took over practically the entire courtroom," and "jurors were thrust into the role of celebrities by the judge's failure to insulate them from reporters and photographers." Id. at 354, 355, 353.

Petitioner's case is manifestly different from the above cases in which the Supreme Court has presumed juror prejudice based on publicity. Here, there is only fleeting mention of at most two news stories in the record, (1 RT 71–72), and there is no indication that any portion of Petitioner's criminal proceedings were "entirely lacking in the solemnity and sobriety to which a defendant is entitled," Murphy, 421 U.S. at 799. Additionally, as noted by the California Court of Appeal, courts have denied change of venue requests under Federal Rule of Criminal Procedure 21[9] in notorious bombing cases, such as the trials of the conspirators in the 1993 bombing of the World Trade Center in New York City. United States v. Yousef, 327 F.3d 56, 78, 155–156 (2d Cir. 2003); United States v. Salameh, No. S5 93 CR. 0180 (KTD), 1993 WL 364486, at *1 (S.D.N.Y. Sept. 15, 1993).

Based on the foregoing, the California Court of Appeal's denial of Petitioner's venue claim was not contrary to, or an unreasonable application of, clearly established federal law,[10] nor was it based on an unreasonable determination of fact. The state court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his first claim, and it should be denied.

**C. Judicial Bias**

In his second claim for relief, Petitioner asserts that he was denied due process because the judge who presided over Petitioner's trial was a victim of the offense. (ECF No. 1 at 5, 11). Respondent argues that this claim was reasonably rejected by the state court. (ECF No. 17 at 24).

---

[9] "[T]he court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21.

[10] Although the California Court of Appeal did not cite to any United States Supreme Court authority on this issue, the pertinent inquiry is whether it "reasonably applied the principles contained in relevant Supreme Court precedent." Parker v. Small, 665 F.3d 1143, 1148 n.1 (9th Cir. 2011) (citing Early v. Packer, 537 U.S. 3, 8 (2002)). The Supreme Court has noted that a state court is not required to cite or even be aware of its cases under § 2254(d). Early, 537 U.S. at 8.

This judicial bias claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. (LDs 9, 10). As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's judicial bias claim, the California Court of Appeal stated:

### IV. *Neutral and detached magistrate*

As noted above, defendant insists his failure to object to the trial judge or move for a change of venue has not resulted in forfeiture or waiver of his due process contentions because he was tried by an "unfair tribunal presided over by a victim of the crime" and, as a result, this state's criminal jurisprudence has sunk "to the level of promoting expediency at the expense of a defendant's right to due process and a fair trial."

"[A] defendant has a due process right to an impartial judge, and ... violation of this right is a fatal defect in the trial mechanism." (*People v. Brown* (1993) 6 Cal.4th 322, 333.) Thus, a defendant has a right to a trial "before a judge with no actual bias against the defendant or interest in the outcome of his particular case...." (*People v. Harris* (2005) 37 Cal.4th 310, 346; see also *Bracy v. Gramley* (1997) 520 U.S. 899, 904–905.)

When judicial bias is raised as an issue on appeal, the "role of a reviewing court 'is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial. [Citation.]' [Citation.]" (*People v. Harris, supra,* 37 Cal.4th at p. 347.)

There is no evidence in the appellate record to show the trial judge had any actual or implied bias against defendant, or that defendant was not tried before a neutral and detached magistrate. There is no evidence the trial judge in this case was in the courthouse when it was briefly evacuated because of the fake bomb, the judge was a witness to the incident, or that the discovery of the fake bomb and evacuation had a particular impact which would have raised questions about the trial judge's impartiality. The court did not make any comments indicating a personal interest, particular knowledge, or sensitivities about the case. The court did not make any rulings or engage in any conduct to manifest bias in the presentation of evidence, usurp the duties of the prosecutor, or create the impression it was allied with the prosecution. (*People v. Harris, supra,* 37 Cal.4th at p. 346.)

Defense counsel was well aware of the circumstances of the charges against defendant. Defense counsel was also aware of the appropriate procedures to disqualify a judge. At the beginning of the criminal proceedings, defense counsel moved to disqualify Judge Boscoe, who was originally assigned to the case, pursuant to Code of Civil Procedure section 170.6. When Judge Provost was

1    assigned, defense counsel did not raise any objections, attempt to disqualify her
2    from presiding over defendant's case, or challenge her for cause or bias.

3    The entirety of the record refutes defendant's general assertions and claims of
     certainty the trial judge was biased against him. The court denied the
     prosecution's motion to impeach defendant's girlfriend with defendant's prior act
4    of domestic violence against her, agreed with defendant that the evidence was
     prejudicial, and granted the defense motion to exclude this evidence. The court
5    also granted defendant's motion not to impose any sanctions against the defense
     for possible violations of the discovery order. More importantly as to the issues
6    raised by defendant, the court recognized the importance of questioning the
     prospective jurors about their possible exposure to news stories about either the
7    fake bomb or the arson of the patrol cars.

8    There is no evidence that defendant was not tried before a neutral and detached
     magistrate. As with defendant's other issues, defense counsel was not ineffective
9    for failing to challenge the trial judge given the absence of any evidence to
     support that challenge. (*People v. Diaz, supra,* 3 Cal.4th at p. 562.)
10

11   Keever, 2014 WL 3738768, at *9–10.

12       The Supreme Court has long recognized that due process "clearly requires a 'fair trial in a

13   fair tribunal' before a judge with no actual bias against the defendant or interest in the outcome

14   of his particular case." Bracy v. Gramley, 520 U.S. 899, 904–05 (1997) (quoting Withrow v.

15   Larkin, 421 U.S. 35, 46 (1975)). "The Constitution requires recusal where 'the probability of

16   actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'"

17   Hurles v. Ryan, 752 F.3d 768, 788 (9th Cir. 2014) (quoting Withrow, 421 U.S. at 47). Thus, to

18   establish a due process violation Petitioner need not prove actual bias, just an intolerable risk of

19   bias. Hurles, 752 F.3d at 789. However, Petitioner must "overcome a presumption of honesty

20   and integrity in those serving as adjudicators." Withrow, 421 U.S. at 47.

21       As noted by the California Court of Appeal, there is no evidence in the record that the

22   trial judge was present in the courthouse when it was evacuated due to the fake bomb or that the

23   trial judge was otherwise a witness to the incident. Petitioner has not pointed to any evidence in

24   the record demonstrating that the trial judge harbored bias against him or that there was an

25   intolerable risk of bias. Petitioner has failed to "overcome [the] presumption of honesty and

26   integrity in those serving as adjudicators." Withrow, 421 U.S. at 47.

27       Based on the foregoing, the California Court of Appeal's denial of Petitioner's judicial

28   bias claim was not contrary to, or an unreasonable application of, clearly established federal law,

nor was it based on an unreasonable determination of fact. The state court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his second claim, and it should be denied.

### D. Juror Bias

In his third claim for relief, Petitioner asserts that his right to due process and a fair trial was violated by the absence of an impartial jury. (ECF No. 1 at 5). Respondent argues that the unfair jury claim was reasonably rejected by the state court. (ECF No. 17 at 34).

The juror bias claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. (LDs 9, 10). As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. <u>See</u> <u>Brumfield</u>, 135 S. Ct. at 2276; <u>Ylst</u>, 501 U.S. at 806.

In denying Petitioner's juror bias claim, the California Court of Appeal stated:

### III. *Jury selection*

The federal and state Constitutions guarantee criminal defendants a fair trial by a panel of unbiased, impartial jurors. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16; *People v. Roldan* (2005) 35 Cal.4th 646, 689, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "A prospective juror's ability to be fair and impartial is explored during the process of voir dire," which may result in challenges for cause or peremptory challenges based on the prospective juror's responses. (*People v. Duran* (1996) 50 Cal.App.4th 103, 111; e.g., *People v. Valdez* (2012) 55 Cal.4th 82, 165; *People v. Carasi* (2008) 44 Cal.4th 1263, 1325.)

Defendant repeatedly complains that his due process rights were violated because the jury was biased against him, without any evidence to support these claims. In making these arguments, however, he fails to account for what actually happened on the record.

Just before the beginning of jury selection, the prosecutor advised the court that the newspaper had covered the fake bomb threat, and the issue should be addressed during voir dire to determine if the potential jurors heard about it. The court asked the parties whether it should also ask the potential jurors about the arson of the patrol cars, even though it was not related to the fake bomb and defendant was not charged with that offense. Defense counsel agreed the court

should ask about the arson and the fake bomb since both incidents were going to be addressed during trial.[11]

The court stated it would ask the potential jurors about both incidents, and noted the arson of the patrol cars "got a lot of coverage, probably more than" the fake bomb. Defense counsel replied the arson received "[m]uch more" coverage, and she thought there was only one article about the fake bomb. Defendant interrupted and said there were two articles about his case. Defense counsel did not introduce any newspaper reports or evidence about any media reports about the fake bomb into evidence, and they were not referred to again.

Defendant did not request the transcription of the voir dire proceedings for purposes of appeal. Based on our review of the minute order for voir dire, however, there is no evidence that these two topics prevented the court and the parties from agreeing on the selection of a jury. Defendant did not object to the voir dire process or to the jurors who were ultimately selected and sworn. If defendant had been concerned about the outcome of voir dire, he could have moved for a change of venue after the conclusion of jury selection and argued that voir dire showed that it was impossible to receive a fair trial in Tuolumne County. (See, e.g., *People v. Farley* (2009) 46 Cal.4th 1053, 1085.) Defendant's failure to make a motion for change of venue, either before or after voir dire, constitutes his forfeiture of that issue. (*People v. Bolin* (1998) 18 Cal.4th 297, 312–313.)

Defendant asserts that defense counsel was prejudicially ineffective for failing to make the necessary motions to preserve his appellate contentions. Based on the record before this court, however, defense counsel was not ineffective for declining to bring an apparently meritless motion. (*People v. Diaz, supra,* 3 Cal.4th at p. 562; *People v. Bolin, supra,* 18 Cal.4th at p. 314.)

Keever, 2014 WL 3738768, at *8–9 (footnote in original).

"No hard-and-fast formula dictates the necessary depth or breadth of *voir dire*." Skilling, 561 U.S. at 386 (citing United States v. Wood, 299 U.S. 123, 145–46 (1936) ("Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.")). The Supreme Court has "repeatedly emphasized" that jury selection is "particularly within the province of the trial judge," and "[r]eviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection,

---

[11] As explained in the factual statement above, Deputy Vanderwiel testified defendant contacted him and claimed he had information about who was responsible for both the fake bomb and the apparently unrelated arson of several patrol cars. Vanderwiel also testified that someone else was convicted for the arson of the patrol cars, and defendant was not involved in that case.

sincerity, demeanor, candor, body language, and apprehension of duty." Skilling, 561 U.S. at 386 (quoting Ristaino v. Ross, 424 U.S. 589, 594–95 (1976)) (citing Reynolds v. United States, 98 U.S. 145, 156–57 (1879)).

There is no transcript of the *voir dire* proceedings in the state record. However, prior to jury selection, the trial court indicated that it would ask the potential jurors about their exposure to coverage of the fake bomb threat and the arson of patrol cars. Additionally, the minute order of the *voir dire* proceedings does not indicate that defense counsel objected to any aspect of the jury selection process or to the venire members who were ultimately seated on the jury.

Based on the foregoing, the California Court of Appeal's denial of Petitioner's juror bias claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The state court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his third claim, and it should be denied.

### E. Prosecutorial Misconduct

In his fourth claim for relief, Petitioner asserts that the prosecutor committed misconduct by emphasizing the fear and disruption inflicted upon the prosecutor and court and the proximity of the bomb threat to the jury box. (ECF No. 1 at 5, 14). Respondent argues that the prosecutorial misconduct claim has been procedurally defaulted and was reasonably rejected by the state court. (ECF No. 17 at 36).

The prosecutorial misconduct claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. (LDs 9, 10). As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

///

///

21

In denying the prosecutorial misconduct claim, the California Court of Appeal stated:

## V. *Prosecutorial misconduct*

Finally, defendant contends the prosecutor committed prejudicial misconduct during trial by referring to facts not in evidence about the fake bomb. As we will explain, defense counsel did not object to these instances and the context of the prosecutor's remarks refutes any claim of misconduct.

### A. *Background*

The prosecutor's first witness was Charles Combs, the private security guard who found the fake bomb. The prosecutor asked Combs several questions to verify that he worked in "this courthouse," and he contacted Deputy Green in the bailiff's area of Department 2 and told him about the suspicious package.

In closing argument, the prosecutor stated:

> "We know that this bag with this device is located outside of the courthouse at 8:40 in the morning on November 28th. And we know that at 9:15, the decision is made to evacuate the courthouse. *We were all evacuated out.* The bomb squad arrives at 9:20 and determines it is a fake bomb. So at 10:45, *we're allowed to come back into court and resume our business.* The defendant is set for sentencing, actually, at 1:30 that day." (Italics added.)

Defense counsel did not object to any of these incidents.

### B. *Analysis*

We begin with the well settled law on prosecutorial misconduct. "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202.)

Defendant cites the italicized portion of the prosecutor's closing argument and argues the prosecutor committed misconduct. "To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct. [Citation.]" (*People v. Price* (1991) 1 Cal.4th 324, 447; *People v. Silva* (2001) 25 Cal.4th 345, 373.)

Defense counsel did not make prosecutorial misconduct objections or request admonitions to any of the instances which defendant now raises on appeal, which precludes his appellate claims of misconduct. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000; *People v. Cain* (1995) 10 Cal.4th 1, 48.)

In the alternative, defendant claims counsel was prejudicially ineffective for failing to preserve the objections because the prosecutor's comments made the jury understand "it was not some other courthouse that was threatened but their courthouse, the very one in which they were sitting in judgment of the false bomber. It would take a superhuman effort to resist thinking of one's own reaction under the threat allegedly imposed by [defendant]."

The prosecutor's closing argument cited to admissible evidence about the fake bomb incident, and was not based on any facts outside the record. As we have already explained, defendant failed to move for a change of venue supported by appropriate exhibits to support his claims about the alleged impossibility of obtaining a fair trial in Tuolumne County, or that the trial judge was not neutral and detached. Defendant has also failed to account for the trial judge's decision to question the prospective jurors about their possible exposure to any pretrial publicity about the fake bomb, and the absence of any objections to the jurors who were ultimately selected and sworn in this case.

We similarly conclude that defense counsel was not prejudicially ineffective for failing to object to the prosecutor's isolated comments about the nature and circumstances of the charged offense.

Keever, 2014 WL 3738768, at *10–11.

### 1. Procedural Default

Here, the California Court of Appeal clearly and expressly stated that Petitioner forfeited the prosecutorial misconduct claim by failing to contemporaneously object to any of the instances of misconduct. As discussed in section IV(A), *supra*, the contemporaneous objection rule is adequate to bar federal habeas review. See Kelly, 599 F. App'x at 268. A petitioner, however, may obtain federal review of a defaulted claim by demonstrating either cause for the default and prejudice or that failure to consider the claim will result in a fundamental miscarriage of justice. Jones, 691 F.3d at 1101. Ineffective assistance of counsel provides "cause" to excuse procedural default, Coleman, 501 U.S. at 754, but the Court applies different standards when reviewing ineffective assistance of counsel "as a substantive basis of relief and as cause to avoid default of other claims." Visciotti, 862 F.3d at 769. If the procedural bar issue is more complex than the merits issue, courts may "proceed to the merits if the result will be the same." Franklin, 290 F.3d at 1232. Accordingly, the Court will proceed to review the prosecutorial misconduct claim on the merits applying AEDPA deference. See Apelt, 878 F.3d at 825.

### 2. Merits Analysis

A prosecutor's improper comments violate the Constitution if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotation marks omitted) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); Parker v. Matthews, 567 U.S. 37, 45 (2012). As "the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of

23

due process, and not the broad exercise of supervisory power,'" it "is not enough that the prosecutors' remarks were undesirable or even universally condemned." <u>Darden</u>, 477 U.S. at 181 (citations omitted). "On habeas review, constitutional errors of the 'trial type,' including prosecutorial misconduct, warrant relief only if they 'had substantial and injurious effect or influence in determining the jury's verdict.'" <u>Wood v. Ryan</u>, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting <u>Brecht</u>, 507 U.S. at 637–38).

In support of his prosecutorial misconduct claim, Petitioner cites to the prosecutor's elicitation of testimony from Mr. Combs and Deputy Green. (ECF No. 1 at 14). The prosecutor engaged in the following pertinent exchange with Charles J. Combs on direct examination:

> Q. And do you recall what your assignment was on November 28th of 2011?
>
> A. Uh, I was working the screening station here at what we call Post 2, which is 41 West Yaney.
>
> Q. That is this courthouse?
>
> A. That is this courthouse.
>
> Q. Okay. And what time did you arrive at work that day?
>
> A. Uh, about ten minutes to 7:00.
>
> Q. And when you first arrived, what did you do?
>
> A. At that time, the routine was to just go ahead and open up the courthouse, so I proceeded directly from the parking garage across the street, up to the second floor, entered the building that way, and then proceeded with the morning opening routines.
>
> Q. So let me just get a clear picture. Where exactly did you enter this courthouse that day? Not here (indicating)?
>
> A. Not here. The second floor.

(1 RT 93–94).

The prosecutor engaged in the following pertinent exchange with Deputy Brandon Green on direct examination:

> Q. And what was your assignment at that time?
>
> A. I was assigned as a bailiff to this court.

Q. Department 2 right here?

A. No, the court system here.

Q. Oh, okay. And that day, November 28th, 2011, do you recall which courthouse you were working in, either this one or the one on Washington?

A. I was actually assigned to a roving position and I went back and forth between the courthouses. That day, I was primarily at this courthouse.

Q. Okay. And do you recall C.J. Combs, who works for Universal Protection Services, at some point the morning of November 28th, 2011 getting your attention?

A. Yes, I do.

Q. What do you recall about that?

A. I was sitting in the Department 2 bailiff's area of the judge's chambers. There was a knock on the door.

Q. Is that this door right out here (indicating)?

A. Right; yes. It says "Judge's Chambers."

There was a knock at the door. I answered the door, and C.J. asked me to come take a look at a bag.

(1 RT 104–05).

Courts "have consistently cautioned against prosecutorial statements designed to appeal to the passions, fears and vulnerabilities of the jury." <u>United States v. Weatherspoon</u>, 410 F.3d 1142, 1149 (9th Cir. 2005). "[I]f the purpose and effect of the prosecutor's emotionally charged appeal was 'wholly irrelevant to any facts or issues in the case,' then it 'could only have been to arouse passion and prejudice.' [If] the statements and arguments in question were relevant, they fall outside the prohibited arena." <u>Tak Sun Tan v. Runnels</u>, 413 F.3d 1101, 1115 (9th Cir. 2005) (quoting <u>Viereck v. United States</u>, 318 U.S. 236, 247 (1943)). Viewed in context, the prosecutor's questions were not designed to appeal to the jury's fears and vulnerabilities. Rather, the prosecutor elicited admissible testimony regarding the circumstances of the offense and the witnesses' actions and locations at the time of the offense.

Petitioner also challenges portions of the prosecutor's closing argument as "provok[ing] sympathy to the prosecution and anger at [Petitioner] for his alleged acts." (ECF No. 1 at 15).

The prosecutor stated in pertinent part:

> So, I would like to refer to this sort of story we got from the defense witnesses as the tangled web, because it really doesn't add up at all. So let's look at the timeline.
>
> We know that this bag with this device is located outside of the courthouse at 8:40 in the morning on November 28th. And we know that at 9:15, the decision is made to evacuate the courthouse. We were all evacuated out. The bomb squad arrives at 9:20 and determines it is a fake bomb. So at 10:45, we're allowed to come back into court and resume our business. The defendant is set for sentencing, actually, at 1:30 that day.

(2 RT 270). Viewed in context, the prosecutor's statement was not designed to appeal to the jury's fears and vulnerabilities. Rather, this portion of the prosecutor's closing argument was a quick factual summation of the timeline of the offense based on admissible evidence that was presented at trial.

As the prosecutor's elicitation of testimony and "argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent," Petitioner was not deprived of a fair trial. Darden, 477 U.S. at 181–82. Accordingly, Petitioner is not entitled to habeas relief on his fourth claim, and it should be denied.

## F.  Ineffective Assistance of Counsel

In his fifth claim for relief, Petitioner asserts ineffective assistance of counsel for failure to effectuate Petitioner's desired results regarding his other claims for relief (i.e., change of venue, judicial bias, juror bias, and prosecutorial misconduct). (ECF No. 1 at 5). Respondent argues that the state court's rejection of the ineffective assistance of counsel claim was reasonable. (ECF No. 17 at 40).

The ineffective assistance of counsel claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim was also raised in the petition for review, which the California Supreme Court summarily denied. (LDs 9, 10). As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying the ineffective assistance of counsel claim, the California Court of Appeal stated:

> ### Ineffective assistance
>
> In the alternative, defendant argues his defense attorney was prejudicially ineffective for failing to make whatever motions were required to effectuate these results. To prevail on an ineffective assistance claim, "defendant must first show that ' "counsel's representation fell below an objective standard of reasonableness ... under prevailing professional norms." ' [Citation.] Second, defendant must show that the inadequacy was prejudicial, that is, ' "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' [Citation.] [¶] If 'counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed.' [Citation.] When, however, the record sheds no light on why counsel acted or failed to act in the manner challenged, the reviewing court should not speculate as to counsel's reasons. To engage in such speculations would involve the reviewing court ' "in the perilous process of second-guessing." ' [Citation.] Because the appellate record ordinarily does not show the reasons for defense counsel's actions or omissions, a claim of ineffective assistance of counsel should generally be made in a petition for writ of habeas corpus, rather than on appeal. [Citations.]" (*People v. Diaz* (1992) 3 Cal.4th 495, 557–558.)
>
> As we have already explained, there is no evidence in the appellate record to support defendant's due process contentions, or to show that a motion for change of venue should have been filed or would have been successful. Based on the record before this court, defense counsel was not ineffective for declining to bring a meritless motion. (*People v. Diaz, supra,* 3 Cal.4th at p. 562.)

Keever, 2014 WL 3738768, at *7–8.

1.  Strickland Legal Standard

The clearly established federal law governing ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984), which requires a petitioner to show that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." Id. at 687. To establish deficient performance, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness" and "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 688, 687. Judicial scrutiny of counsel's performance is highly deferential. A court indulges a "strong presumption" that counsel's conduct falls within the "wide range" of reasonable professional assistance. Id. at 687. To establish prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 694. A court "asks whether it is 'reasonable likely' the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable." <u>Richter</u>, 562 U.S. at 111–12 (citing <u>Strickland</u>, 466 U.S. at 696, 693).

When § 2254(d) applies, "[t]he pivotal question is whether the state court's application of the <u>Strickland</u> standard was unreasonable. This is different from asking whether defense counsel's performance fell below <u>Strickland</u>'s standard." <u>Richter</u>, 562 U.S. at 101. Moreover, because <u>Strickland</u> articulates "a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (citing <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). "The standards created by <u>Strickland</u> and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." <u>Richter</u>, 562 U.S. at 105 (citations omitted). Thus, "for claims of ineffective assistance of counsel . . . AEDPA review must be 'doubly deferential' in order to afford 'both the state court and the defense attorney the benefit of the doubt.'" <u>Woods v. Donald</u>, 135 S. Ct. 1372, 1376 (2015) (quoting <u>Burt v. Titlow</u>, 571 U.S. 12, 15 (2013)). When this "doubly deferential" judicial review applies, the appropriate inquiry is "whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Richter</u>, 562 U.S. at 105.

2. <u>Analysis</u>

"Generally, a defendant claiming ineffective assistance of counsel for failure to file a particular motion must not only demonstrate a likelihood of prevailing on the motion, but also a reasonable probability that the granting of the motion would have resulted in a more favorable outcome in the entire case." <u>Styers v. Schriro</u>, 547 F.3d 1026, 1030 n.5 (9th Cir. 2008). As set forth in section IV(B), *supra*, Petitioner's case was manifestly different from the cases in which the Supreme Court has presumed juror prejudice based on publicity. Therefore, Petitioner has not established that defense counsel would have prevailed on a motion to change venue. Additionally, as discussed in sections IV(C)–(E), Petitioner has not established that the judge and

jury were biased or that the prosecutor engaged in misconduct. Accordingly, Petitioner has not demonstrated that but for counsel's deficient performance there is "a reasonable probability that . . . the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Therefore, under the "doubly deferential" AEDPA review of ineffective assistance of counsel claims, the California Court of Appeal's denial was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his fifth claim, and it should be denied.

**G. Sufficiency of the Evidence**

In his sixth claim for relief, Petitioner appears to assert there was insufficient evidence to support his conviction. (ECF No. 1 at 17). This claim was not raised on appeal. If a petitioner has not sought relief in the highest state court for a claim raised in a federal petition, the Court cannot proceed to the merits of that claim. 28 U.S.C. § 2254(b)(1). However, pursuant to 28 U.S.C. § 2254(b)(2), the Court may deny an unexhausted claim on the merits "when it is perfectly clear that the [petitioner] does not raise even a colorable federal claim." Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005) (adopting the standard set forth in Granberry v. Greer, 481 U.S. 129, 135 (1987)).

The Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Viewing the record in the light most favorable to the prosecution, a rational trier of fact could have found true beyond a reasonable doubt that Petitioner planted the false bomb in front of the courthouse. There was evidence presented at trial that Petitioner was not in custody at the time of the incident, Petitioner was familiar with the bag in which the fake bomb was found, and the DNA swabbed from the fake bomb's black electrical tape matched Petitioner's DNA profile. (1 RT

128–29, 133–34, 151; 2 RT 195–200). Although witnesses also testified that Petitioner claimed to have overheard others bragging about the details of the fake bomb, Petitioner's garage was burglarized multiple times over the years, and Petitioner sold, gave away, and disposed of the contents of the garage, (1 RT 135–36, 148–49, 156; 2 RT 230–31), a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326.

Petitioner argues there was no evidence introduced that directly showed who planted the false bomb. However, "[c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." Ngo v. Giurbino, 651 F.3d 1112, 1114 (9th Cir. 2011) (internal quotation marks omitted) (quoting Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995)). "When 'determining the sufficiency of circumstantial evidence, the question is not whether the evidence excludes every hypothesis except that of guilt but rather whether the trier of fact could reasonably arrive at its conclusion.'" United States v. Doe, 842 F.3d 1117, 1120 (9th Cir. 2016) (quoting United States v. Nevils, 598 F.3d 1158, 1165 (9th Cir. 2010)).

Petitioner also argues that he had an alibi in the form of Donna Ratliff's testimony that he had been at home with her the morning of the incident. (ECF No. 1 at 17). In light of the verdict, the jury clearly did not find Donna Ratliff to be credible. "[U]nder Jackson, the assessment of credibility of witnesses is generally beyond the scope of review." Schlup v. Delo, 513 U.S. 298, 330 (1995). See Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004) ("A jury's credibility determinations are . . . entitled to near-total deference under Jackson.").

Based on the foregoing, the Court finds it is "perfectly clear" that Petitioner does not raise a colorable sufficiency of the evidence claim under Jackson. See Cavazos v. Smith, 556 U.S. 1, 2 (2011) (Jackson "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."). Accordingly, the Court may deny Petitioner's sufficiency of the evidence claim on the merits pursuant to 28 U.S.C. § 2254(b)(2).

**H.  Certificate of Appealability**

Having found that Petitioner is not entitled to habeas relief, the Court now turns to the question of whether a certificate of appealability should issue. See Rule 11, Rules Governing Section 2254 Cases. A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 537 U.S. 322, 335–36 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c) (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
>
>> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>>
>> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

28 U.S.C. § 2253.

If a court denies a habeas petition on the merits, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of [the petitioner's] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he

must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." <u>Miller-El</u>, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner's federal habeas corpus petition should be denied debatable or wrong, or that the issues presented are deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Therefore, the Court declines to issue a certificate of appealability.

## V.

## ORDER

Accordingly, the Court HEREBY ORDERS that:

1. The petition for writ of habeas corpus is DENIED;

2. The Clerk of Court is DIRECTED to CLOSE the case; and

3. The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:  **June 26, 2018**  _____
/s/ Eric P. Groig
UNITED STATES MAGISTRATE JUDGE